FILED

2017 MAY -5  PM 3:38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

1  MICHAEL J. KHOURI, ESQ. [SBN 97654]
   Email:    mkhouri@khourilaw.com
2  ANDREW B. GOODMAN, ESQ. [SBN 267972]
   Email:    agoodman@khourilaw.com
3  KHOURI LAW FIRM, APC
   24012 Calle De La Plata, Suite 210
4  Laguna Hills, California 92653
   Telephone:  (949) 336-2433
5  Fax:        (949) 387-0044

6  Attorneys for qui tam plaintiff MARK SPICER

7

8               UNITED STATES DISTRICT COURT

9    FOR THE CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

10

11  UNITED STATES OF AMERICA ex          Case No.  CV17 -00881 JGB(KK)
    rel. MARK SPICER,
12
                                         PLAINTIFF'S COMPLAINT FOR
13                                       DAMAGES FOR:
                 Plaintiff,
14                                       (1) VIOLATIONS OF FALSE
                                         CLAIMS ACT (31 U.S.C. §
15  vs.                                  3729(a)(1)(A))

16  BRET B. ABSHIRE, M.D., an            (2) VIOLATIONS OF FALSE
    individual; ALPHATEC HOLDINGS,       CLAIMS ACT (31 U.S.C. §
17  INC., a Delaware corporation;        3729(a)(1)(B))
    ALPHATEC SPINE, INC. a California
18  corporation; SOUTHWEST               DEMAND FOR JURY TRIAL
    HEALTHCARE SYSTEM
19  AUXILIARY, INC., a California non-   [FILED IN CAMERA AND
    profit corporation; and DOES 1 to 50, UNDER SEAL PURSUANT TO 31
20                                       U.S.C. § 3730(b)(2)]
                 Defendants.
21

22

23

24                                       ORIGINAL

25

26

27                                       PAID LA 153997

28                                       MAY - 5 2017

                                         Clerk, US District Court
                                         COURT 4612

                         1
                    COMPLAINT

1    Qui tam plaintiff MARK SPICER ("Spicer") respectfully alleges as follows:

2    **I.    INTRODUCTION**

3         1.    In this action, Spicer alleges that defendants BRET B. ABSHIRE,

4    M.D. ("Abshire"), ALPHATEC HOLDINGS, INC. ("Alphatec Holdings"),

5    ALPHATEC SPINE, INC. ("Alphatec Spine"), SOUTHWEST HEALTHCARE

6    SYSTEM AUXILIARY, INC. ("Southwest"), and DOES 1 to 50 (collectively,

7    Abshire, Alphatec Holdings, Alphatec Spine, Southwest, and DOES 1 to 50 are

8    "Defendants") are liable under 31 U.S.C. § 3729, et seq. (the "False Claims Act").

9    The events in this action date back to 2007, when Abshire and Spicer were partners

10   at the neurosurgery department at the University of California, San Diego

11   ("UCSD"). Spicer and Abshire were partners at UCSD from 2004 until December

12   31, 2008. Spicer and Abshire already had a contentious relationship by 2007.

13   Spicer complained against Abshire to the American Board of Neurological

14   Surgery, and corroborated his complaint with written evidence. According to

15   Spicer's allegations, Abshire improperly obtained advance knowledge of a

16   practical exam question from a board member of the American Board of

17   Neurological Surgery. Spicer incidentally came across another more troubling

18   example of Abshire's ethics when he was at the Inland Valley Regional Medical

19   Center (one of Southwest's hospitals) on or around February 19, 2007. One of

20   Abshire's patients was in excruciating pain, so much pain, in fact, that her

21   husband, who Spicer knew, called Spicer over to her hospital room to check on

22   her. Abshire performed a spinal fusion surgery on this patient (B.L.). When Spicer

23   reviewed the imaging studies and medical documents for B.L., it was immediately

24   apparent to him that B.L. did not have sufficient back pain to warrant the spinal

25   fusion surgery Abshire performed. Since at least 2006, Spicer heard rumblings

26   from scrub techs that they believed (as compared to Spicer and other physicians)

27   that Abshire used too many screws, bolts, and biologics in his surgeries. After

28   B.L.'s case, Spicer reviewed all of Abshire's cases on an internal tracking and

billing program called MediSoft. Spicer was disturbed at what he found. Not only was Abshire conducting progressively more medically unnecessary spinal fusion surgeries, which can cost hundreds of thousands of dollars for each one, he was removing hardware from a number of patients and replacing it with hardware from Alphatec Spine (subsidiary company of Alphatec Holdings), where he was an investor and advisory board member, and now vice chair. Spicer knows that Abshire's wrongful conduct is continuing, as Spicer has seen at least three patients in recent years that Abshire treated with medically unnecessary spinal surgeries. Because Spicer believes that Abshire's wrongful, greedy, and unethical conduct will continue to damage both plaintiff UNITED STATES OF AMERICA ("United States" or "United States of America") and patients who do not know any better, Spicer alleges that Defendants are liable under the False Claims Act, as described in more detail below.

## II.   JURISDICTION AND VENUE

2.   Spicer brings this action on behalf of the United States under the provisions of the False Claims Act. Accordingly, this Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345.

3.   This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the defendants because Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and the alleged acts in violation of the False Claims Act occurred within this judicial district.

4.   Venue is appropriate in this judicial district under 31 U.S.C. § 3732(a) because Defendants reside in and transact business in this judicial district; their principal places of business are located in this judicial district; and the acts alleged below (as violations of 31 U.S.C. §§ 3729(a)(1)(A), (B)) occurred in this judicial district.

**COMPLAINT**

## III.   THE PARTIES

5.     The United States is the plaintiff in this action. Spicer is seeking recovery on the United States' behalf.

6.     Spicer is an individual and citizen of the United States of America residing in Riverside County, California. Spicer is a neurosurgeon licensed to practice medicine in the State of California.

7.     The allegations and transactions upon which Spicer bases this complaint were not publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party. Nor have they been disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in the news media.

8.     Spicer is the original source of information in this complaint. Spicer has voluntarily disclosed to the government the information on which the allegations and transactions in this complaint are based. Spicer's disclosure to the government was contemporaneous with the filing of the complaint, and Spicer acted on his own accord, without compensation or legal obligation to provide the information.

9.     Spicer's knowledge of the allegations and transactions in this complaint is derived from his own efforts and labor. Spicer's knowledge is not based on publicly disclosed information, and his knowledge preceded any public disclosure of the allegations and transactions in this complaint.

10.     Abshire is an individual and citizen of the United States of America residing in Riverside County, California. Abshire is a neurosurgeon licensed to practice medicine in the State of California. Upon information and belief, Abshire has been an investor and advisory board member of Alphatec Holdings since at least 2006 to the present.

11.     Alphatec Holdings is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Carlsbad,

California. Alphatec Holdings is the parent company of Alphatec Spine.

12.    Alphatec Spine is a corporation organized and existing under the laws of the State of California, with a principal place of business in Carlsbad, California. Alphatec Spine is a global medical device and technology company that designs, develops, manufactures, and markets spinal fusion technology products and solutions for the treatment of spinal disorders.

13.    Southwest is a non-profit corporation organized and existing under the laws of the State of California, with a principal place of business in Murietta, California. Southwest is comprised of two acute-care facilities: the Inland Valley Regional Medical Center in Wildomar, California, and the Rancho Springs Medical Center in Murietta, California.

14.    Spicer is ignorant of the true names and capacities, whether individual, partnership, corporate, associate or otherwise, of defendant DOES 1 through 50, inclusive, and therefore sues these defendants by fictitious names. Spicer is informed and believes, and on that basis alleges, that these fictitiously named defendants, and each of them, are in some manner responsible and liable for the acts and/or damages alleged in this Complaint. Spicer will seek leave of court to amend this Complaint to show the fictitiously named defendants' true names and capacities when they have been ascertained. Spicer is informed and believes, and on that basis alleges, that each of the fictitiously named defendants was, in some manner, responsible for the occurrences herein alleged, and proximately caused the damages alleged in this Complaint.

15.    Spicer is informed and believes, and on that basis alleges, that at all relevant times (except where pled otherwise) Defendants were acting as the agents, servants, employees, partners, and/or joint venturers of each other. Defendants maintain such unity of interest that separate personalities of each defendant no longer exist. In doing the wrongful acts alleged herein, each defendant was acting in the full course and scope of such agency, employment, partnership, and/or joint

COMPLAINT

venture with the full knowledge, consent, permission, and ratification, either express or implied, of each of the other defendant; and as such, was acting as the alter ego of each other defendant. Adherence to the fiction of the separate existence of each defendant would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

## IV.    THE FALSE CLAIMS ACT

16.    The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the False Claims Act in 1986 to enhance the ability of the United States to recover losses sustained due to fraud against it.

17.    On May 20, 2009, Congress amended and renumbered the False Claims Act again pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA").

18.    The False Claims Act, under the FERA amendments, sets forth liability, in pertinent part, for any person who:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

31 U.S.C. §§ 3729(a)(1)(A)-(B)(emphases added).

19.    The False Claims Act further provides, in pertinent part, that "knowing" and "knowingly:"

> (A) mean that a person, with respect to information—
>> (i)      has actual knowledge of the information;
>> (ii)     acts in deliberate ignorance of the truth or falsity of the information; or
>> (iii)    acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud.

31 U.S.C. §§ 3729(b)(1)(A)-(B).

And the term, "claim:"

> (A)    means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

6

(i)   is presented to an officer, employee, or agent of the United States; or

(ii)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)  will reimburse such contractor, grantee, or other recipient for any portion of the money or other property which is requested or demanded; and

(B)  does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property; . . .

31 U.S.C. §§ 3729(b)(2)(A)-(B).

20.   Under Section 4(f) of the FERA amendments, 31 U.S.C. § 3729(b)(1)(A) (formerly 31 U.S.C. § 3729(a)(1)) applies to conduct on or after May 20, 2009. 31 U.S.C. § 3729(b)(1)(B) (formerly 31 U.S.C. § 3729(a)(2)) applies to all claims that were pending on or after June 7, 2008.

21.   31 U.S.C. § 3729(a)(1) of the pre-FERA False Claims Act provides that any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States . . . a false or fraudulent claim for payment or approval" is liable for a civil penalty of "not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

22.   31 U.S.C. § 3729(a)(2) of the pre-FERA False Claims Act provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(2).

23.   The False Claims Act allows any person having information about a possible violation of the False Claims Act to bring an action on behalf of the United States, and to share in any recovery. 31 U.S.C. §§ 3730(b), (d)(1). The

COMPLAINT

1    False Claims Act also awards reasonable attorneys' fees and costs to the prevailing

2    qui tam plaintiff as a matter of right. 31 U.S.C. § 3730(d)(1).

3    **V.      THE MEDICARE AND MEDICAID PROGRAMS**

4          24.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq.,

5    establishes the Health Insurance for the Aged and Disabled Program, commonly

6    referred to as the Medicare Program (the "Medicare Program" or "Medicare").

7          25.    The Medicare Program is comprised of four parts: A, B, C, and D.

8          26.    Medicare Part B provides federal government funds to help pay for

9    professional services performed by physicians, including surgery, and provided to

10   Medicare beneficiaries, so long as such services are "reasonable and necessary for

11   the diagnosis or treatment of illness or injury or to improve the functioning of a

12   malformed body member." *See* 42 U.S.C. §§ 1395x(q), (r), (s)(1), 1395y(a)(1)(A).

13         27.    Physicians' services are listed as covered medical and other health

14   services under Medicare Part B. *See* 42 C.F.R. §§ 410.10(a), 410.12.

15         28.    Healthcare providers must make certain certifications in connection

16   with the services provided, one of which is sometimes referred to as the "medical

17   necessity" requirement. *See* 42 U.S.C. § 1395f(a)(3).

18         29.    The certifications, including the "medical necessity" requirement, are

19   described in 42 U.S.C. § 1395f, in relevant part, as follows:

20                (a) Requirement of requests and certifications. Except as provided in

21                    subsections (d) and (g) and in section 1876 [42 USCS § 1395mm],

22                    payment for services furnished an individual may be made only to

23                    providers of services which are eligible therefor under section

                     1866 [42 USCS § 1395cc] and only if—

24                    (1) written request, signed by such individual, except in cases in

25                        which the Secretary finds it impracticable for the individual

                         to do so, is filed for such payment in such form, in such

26                        manner, and by such person or persons as the Secretary may

                         by regulation prescribe, no later than the close of the period

27                        ending 1 calendar year after the date of service;

28                    (2) a physician, or, in the case of services described in

                         subparagraph (B), a physician, or a nurse practitioner or

8

clinical nurse specialist who does not have a direct or indirect employment relationship with the facility but is working in collaboration with a physician, or, in the case of services described in subparagraph (C), a physician enrolled under section 1866(j) [42 USCS § 1395cc(j)], certifies (and recertifies, where such services are furnished over a period of time, in such cases, with such frequency, and accompanied by such supporting material, appropriate to the case involved, as may be provided by regulations, except that the first of such recertifications shall be required in each case of inpatient hospital services not later than the 20th day of such period) that-- . . .

> (B) in the case of post-hospital extended care services, such services are or were required to be given because the individual needs or needed on a daily basis skilled nursing care (provided directly by or requiring the supervision of skilled nursing personnel) or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis, for any of the conditions with respect to which he was receiving inpatient hospital services (or services which would constitute inpatient hospital services if the institution met the requirements of paragraphs (6) and (9) of section 1861(e) [42 USCS § 1395x(e)(6) and 9)] prior to transfer to the skilled nursing facility or for a condition requiring such extended care services which arose after such transfer and while he was still in the facility for treatment of the condition or conditions for which he was receiving such inpatient hospital services; . . .

(3) with respect to inpatient hospital services (other than inpatient psychiatric hospital services) which are furnished over a period of time, a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose, except that (A) such certification shall be furnished only in such cases, with such frequency, and accompanied by such supporting material, appropriate to the cases involved, as may be provided by regulations, and (B) the first such certification required in accordance with clause (A) shall be furnished no later than the 20th day of such period; . . .

9

**COMPLAINT**

> To the extent provided by regulations, the certification and recertification of paragraph (2) shall be deemed satisfied where, at a later date, a physician, nurse practitioner, clinical nurse specialist, or physician assistant (as the case may be) makes certification of the kind provided in subparagraph (A), (B), (C), or (D) of paragraph (2) (whichever would have applied), but only where such certification is accompanied by such medical and other evidence as may be required by such regulations. . . .

42 U.S.C. §§ 1395f(a)(1)-(3), flush language.

30.    According to 42 C.F.R. § 412.46(b): "No presumptive weight shall be assigned to the physician's order under § 412.3 or the physician's certification under Subpart B of Part 424 of the chapter in determining the medical necessity of inpatient hospital services under section 1862(a)(1) of the Act [42 U.S.C. § 1395y, *infra*]. A physician's order or certification will be evaluated in the context of the evidence in the medical record."

31.    Providers must assure that they provide economical medical services, and then, only when, and to the extent that they are medically necessary. 42 U.S.C. § 1320c-5(a)(1).

32.    Medicare regulations exclude from payment services that are not reasonable and necessary for any number of reasons. *See generally* 42 C.F.R § 411.15(k)(1)-(16).

33.    Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the federal treasury. Eligible individuals may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by the United States Department of Health & Human Services ("HHS"). *See* 42 U.S.C. §§ 1395o, 1395p, 1395q, 1395r, 1395s.

34.    Payments under the Medicare Part B program are often made directly to service providers, rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits his bill directly to Medicare for payment.

COMPLAINT

35.    The Secretary of HHS administers the Medicare Program through the Centers for Medicare & Medicaid Services ("CMS"), an operating division of HHS.

36.    CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as Part B Carriers (hereinafter, "MACs") to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Medicare Trust Fund"). In this capacity, MACs act on behalf of CMS.

37.    The Medicare Program, through the MAC, pays a significant portion of every claim. The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-payment." Beneficiaries also pay deductibles.

38.    All healthcare providers must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare. A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for the Medicare services.

39.    Title XIX to the Social Security Act establishes the Medicaid Program. *See generally* 42 U.S.C. §§ 1396, et seq.

40.    Under the Medicaid Program, the federal government provides matching funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements.

41.    Although states are not required to participate, those that do must comply with federal Medicaid laws. *See, e.g.,* 42 U.S.C. §§ 1396-1, 1396a.

42.    The State of California administers the Medicaid Program through its own program called the California Medical Assistance Program ("Medi-Cal" or "MediCal"). *See generally* Chapter 7, Part 3, Division 9 of the California Welfare and Institutions Code (sections 14000, et seq.).

43.    Medi-Cal provides health coverage for people with low income and

11

**COMPLAINT**

various disabilities, and is jointly administered by CMS of the federal government and the California Department of Healthcare Services of the California state government.

## VI.   THE ANTI-KICKBACK STATUTE

44.   The federal Anti-Kickback Statute ("AKS") was first enacted in 1972 out of concern that payoffs to those who can influence healthcare decisions will result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal healthcare programs from these difficult-to-detect harms, Congress enacted a broad prohibition against the payment of kickbacks in any form, regardless of whether a particular kickback actually gives rise to overutilization, or results in poor-quality care.

45.   Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. The AKS was further amended in the Patient Protection and Affordable Care Act of 2010 so that "all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act[.]" 155 Cong. Rec. S10854. Even prior to the Affordable Care Act amendments, violations of the AKS still gave rise to False Claims Act liability under the implied false certification theory.

46.   The AKS provides, in relevant part:
(b) Illegal remunerations.
(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in

part under a Federal health care program,

shall be guilty of a felony and conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. §§ 1320a-7b(b)(1)-(2).

47. The AKS continues in paragraph (b)(3) with the following exceptions (paragraphs (3)(A)-(D), (F)-(J) are inapplicable to the present case):

(3) Paragraphs (1) and (2) shall not apply to--

(E) any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection act of 1987 [note to this section] or in regulations under section 1860D-3(e)(6) [1860D-4(e)(6)] [42 § USCS 1395w-104(e)(6)]; . . .

42 U.S.C. §§ 1320a-7b(b)(3)(E)(emphases added).

48. 42 C.F.R. § 1001.952 sets forth "safe harbor" regulations (described in 42 U.S.C. § 1320a-7b(b)(3)(E), *supra*) that describe payment practices that do not violate the AKS, provided the payment practice fits squarely within the safe harbor. 68 Fed. Reg. 14252 (March 24, 2003). Arrangements that do not fit in a safe harbor must be analyzed under the AKS on a case-by-case basis to determine if there is a violation. *Id.*

49. As applied to the present case, the "investment interests" safe harbor

1  is the closest safe harbor that may apply to Abshire's relationship with Alphatec

2  Spine and Alphatec Holdings, but it is ultimately inapplicable. As discussed below,

3  Abshire was not just receiving a return on an investment interest when he removed

4  otherwise functional hardware from patients and replaced it with hardware from

5  Alphatec Spine. Upon information and belief, Abshire was receiving an additional

6  financial incentive from Alphatec Spine and Alphatec Holdings to provide

7  Alphatec Spine hardware to his patients. Regardless, Abshire furnished Alphatec

8  Spine and Alphatec Holdings' hardware to passive investors differently than to

9  non-investors (his patients), and thus failed to meet a key requirement of the

10  "investment interests" safe harbor. *See* 42 C.F.R. § 1001.952(a)(1)(iii), (2)(v),

11  (3)(i)(E).

12      50.    The AKS defines "Federal health care program" as: "(1) any plan or

13  program that provides health benefits, whether directly, through insurance, or

14  otherwise, which is funded directly, in whole or in part, by the United States

15  Government . . . or (2) any State health care program, as defined in section 1128(h)

16  [42 USCS § 1320a-7(h)]." 42 U.S.C. § 1320a-7b(f). This definition encompasses

17  Medicare and Medicaid.

18      51.    Under the Affordable Care Act amendments, any claim submitted for

19  a service, the provision of which resulted from a violation of the AKS, is "false"

20  for purposes of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

21      52.    The Affordable Care Act amendments do not require actual

22  knowledge of the AKS or specific intent to commit a violation of the AKS (and, by

23  extension, the False Claims Act). *See* 42 U.S.C. § 1320a-7b(h).

24      53.    "The key inquiry under the AKS is whether the parties intend to pay,

25  or be paid for referrals. Paying for referrals need not be the only or primary

26  purpose of a payment; as courts have found, if any *one* purpose of the payment is

27  to induce or reward referrals, the statute is violated. (See, e.g., *United States v.*

28  *Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.),

**COMPLAINT**

1     *cert. denied*, 474 U.S. 988 (1985).)" 68 Fed. Reg. 14251 (March 24, 2003)

2     (emphasis in original).

3        54.    "Importantly, under the [AKS], neither a legitimate business purpose

4     for an arrangement nor a fair-market value payment will legitimize a payment if

5     there is also an illegal purpose (i.e., inducing Federal health care program

6     business)." 73 Fed. Reg. 56841 (Sept. 30, 2008)

7     **VII.   BACKGROUND ALLEGATIONS**

8        55.    The basis of the complaint against Abshire is that, for years, he has

9     performed medically unnecessary spinal surgeries that cost approximately

10    $300,000.00 each (e.g., for 20 screws at approximately $2,000.00 apiece; 20 inter-

11    body devices at approximately $3,000.00 apiece; biologics in some cases; and the

12    cost of the surgery). In reality, the patients described below who saw Abshire only

13    required either a localized decompression surgery or a much smaller instrumented

14    fusion surgery, both of which are substantially less costly to the Medicare and/or

15    Medicaid programs.

16        56.    Abshire's billing for each of the medically unnecessary surgeries

17    described below is false, as is Southwest's related billing for a facility fee.

18    Southwest has actual knowledge of Abshire's false claims because Spicer has

19    brought them to the attention of multiple CEOs of Southwest, dating back to at

20    least 2008. No one at Southwest has done anything about Abshire.

21        57.    The hospital's purchase of screws, inter-body devices, etc. from

22    Alphatec Spine—at Abshire's direction during a medically unnecessary removal

23    procedure—is false under the AKS. Abshire removed and replaced preexisting but

24    functional hardware (manufactured by a company in which Abshire had no

25    interest) with hardware manufactured by Alphatec Spine.

26        58.    For example, on or around May 7, 2007, Abshire performed a

27    posterior lumbar interbody fusion on patient, N.B.-D., at the Inland Valley

28    Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support

**COMPLAINT**

1   any indication that N.B.-D. required a posterior lumbar interbody fusion to the
2   extent and degree that Abshire ultimately performed. Upon information and belief,
3   Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840,
4   20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley
5   Regional Medical Center, billed the Medicare program under the applicable
6   CPT/HCPCS codes for the facility fee.

7      59.   On or around May 22, 2007, Abshire performed a posterior lumbar
8   interbody fusion and an iliac crest bone graft surgery on patient, R.O., at the Inland
9   Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not
10   support any indication that R.O. required posterior lumbar interbody fusion or
11   harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately
12   performed. Upon information and belief, Abshire billed the Medicare program
13   under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and
14   parts; and Southwest, via Inland Valley Regional Medical Center, billed the
15   Medicare program under the applicable CPT/HCPCS codes for the facility fee.

16      60.   On or around May 25, 2007, Abshire performed a posterior lumbar
17   interbody fusion and an iliac crest bone graft surgery on patient, A.H., at the Inland
18   Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not
19   support any indication that A.H. required posterior lumbar interbody fusion or
20   harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately
21   performed. Upon information and belief, Abshire billed the Medicare program
22   under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and
23   parts; and Southwest, via Inland Valley Regional Medical Center, billed the
24   Medicare program under the applicable CPT/HCPCS codes for the facility fee.

25      61.   On or around June 4, 2007, Abshire performed a posterior lumbar
26   interbody fusion and an iliac crest bone graft surgery on patient, F.T., at the Inland
27   Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not
28   support any indication that F.T. required posterior lumbar interbody fusion or

COMPLAINT

harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

62.     On or around June 25, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, L.F., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that L.F. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

63.     On or around June 26, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, R.C., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that R.C. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

64.     On or around August 13, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, H.M., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that H.M. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire

17

**COMPLAINT**

ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

65. On or around August 21, 2007, Abshire performed a medically unnecessary posterior lumbar interbody fusion on patient, M.C., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that M.C. required a posterior lumbar interbody fusion to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

66. On or around September 4, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, J.R., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that J.R. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

67. On or around September 11, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, M.H., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that M.H. required posterior lumbar interbody

fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

68.   On or around October 17, 2007, Abshire performed a posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, F.M., at UCSD - Hillcrest. The imaging studies (MRI and/or x-rays) did not support any indication that F.M. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts.

69.   On or around October 30, 2007, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, E.R., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that E.R. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

70.   On or around November 5, 2007, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, N.T., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that N.T. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the

**COMPLAINT**

extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

71. On or around November 12, 2007, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, G.M., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that G.M. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Moreover, Abshire removed hardware during the surgery in order to replace it with hardware from Alphatec Spine. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22849, 22852, 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

72. On or around November 19, 2007, Abshire performed a medically unnecessary re-operative spinal fusion on patient, R.E., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that R.E. required a re-operative spinal fusion to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22849 and 22852 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

73. On or around December 3, 2007, Abshire performed a medically unnecessary removal of hardware on patient, R.A., at the Inland Valley Regional

COMPLAINT

Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that R.A. required the removal of hardware to the extent and degree that Abshire ultimately performed; Abshire replaced the hardware with materials from Alphatec Spine. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22849 and 22852 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

74.     On or around January 14, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, G.B., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that G.B. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

75.     On or around January 17, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, J.E., at UCSD - Hillcrest. The imaging studies (MRI and/or x-rays) did not support any indication that J.E. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts.

76.     On or around January 22, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, J.P., at the Inland Valley Regional Medical Center. The imaging studies

COMPLAINT

(MRI and/or x-rays) did not support any indication that J.P. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts.

77.    On or around February 11, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, B.N., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that B.N. required posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

78.    On or around March 13, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion with autograft on patient, R.B., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that R.B. required posterior lumbar interbody fusion and an autograft from the iliac crest to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

79.    On or around April 7, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion on patient, W.S., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not

1   support any indication that W.S. required a posterior lumbar interbody fusion to
2   the extent and degree that Abshire ultimately performed. Upon information and
3   belief, Abshire billed the Medicare program under CPT Codes 22633, 63047,
4   22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland
5   Valley Regional Medical Center, billed the Medicare program under the applicable
6   CPT/HCPCS codes for the facility fee.

7       80.   On or around April 8, 2008, Abshire performed a medically
8   unnecessary posterior lumbar interbody fusion on patient, M.M., at the Inland
9   Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not
10  support any indication that M.M. required a posterior lumbar interbody fusion to
11  the extent and degree that Abshire ultimately performed. Upon information and
12  belief, Abshire billed the Medicare program under CPT Codes 22633, 63047,
13  22840, 61783, and 20930 for the procedures and parts; and Southwest, via Inland
14  Valley Regional Medical Center, billed the Medicare program under the applicable
15  CPT/HCPCS codes for the facility fee.

16      81.   On or around June 16, 2008, Abshire performed a medically
17  unnecessary removal of hardware on patient, C.T., at the Inland Valley Regional
18  Medical Center. The imaging studies (MRI and/or x-rays) did not support any
19  indication that C.T. required the removal of hardware to the extent and degree that
20  Abshire ultimately performed; Abshire replaced the hardware with materials from
21  Alphatec Spine. Upon information and belief, Abshire billed the Medicare program
22  under CPT Codes 22849 and 22852 for the procedures and parts; and Southwest,
23  via Inland Valley Regional Medical Center, billed the Medicare program under the
24  applicable CPT/HCPCS codes for the facility fee.

25      82.   On or around June 17, 2008, Abshire performed a medically
26  unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery
27  on patient, M.G., at the Inland Valley Regional Medical Center. The imaging
28  studies (MRI and/or x-rays) did not support any indication that M.G. required a

**COMPLAINT**

posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

83. On or around June 23, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, M.W., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that M.W. required a posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

84. On or around June 24, 2008, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, J.D., at the Inland Valley Regional Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that J.D. required a posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree that Abshire ultimately performed. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

85. On or around August 19, 2008, Abshire performed a medically unnecessary removal of hardware on patient, K.L., at the Inland Valley Regional

Medical Center. The imaging studies (MRI and/or x-rays) did not support any indication that K.L. required the removal of hardware to the extent and degree that Abshire ultimately performed; Abshire replaced the hardware with materials from Alphatec Spine. Upon information and belief, Abshire billed the Medicare program under CPT Codes 22849 and 22852 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

86.    On or around May 19, 2014, Abshire performed a medically unnecessary posterior lumbar interbody fusion and an iliac crest bone graft surgery on patient, G.M., at the Inland Valley Regional Medical Center. According to Spicer's secondary medical opinion after viewing pre-operative films, G.M. did not require a posterior lumbar interbody fusion or harvesting of iliac crest bone graft to the extent and degree Abshire ultimately performed; G.M. only needed decompression, not two fusions. Upon information and belief, Abshire billed the Medi-Cal program for the medically unnecessary procedures and parts under CPT Codes 22633, 63047, 22840, 20930, and 20936 for the procedures and parts; and Southwest, via Inland Valley Regional Medical Center, billed the Medicare program under the applicable CPT/HCPCS codes for the facility fee.

87.    Sometime in 2014, Abshire spoke at a conference for neurological surgeons on the Queen Mary in Long Beach, California. Abshire spoke about his surgical techniques (described above). Dr. Pat Johnson, who is now the director of the California Association of Neurosurgeons and is on staff at Cedars-Sinai in Los Angeles, asked Abshire incredulously, "Why are you doing this to people?" Dr. Abshire responded, "Because they have good insurance."

88.    Abshire progressively increased the number of surgeries he performed from around 13 in 2006 to more than 20 in 2007 and 2008. Upon information and belief, Abshire's wrongful conduct is continuing, and Abshire continues to perform at least 20 medically unnecessary surgeries per year, often through Southwest.

COMPLAINT

# FIRST CAUSE OF ACTION

**(For presentation of false claims in violation of the False Claims Act, 31 U.S.C.**

**§ 3729(a)(1)/31 U.S.C. § 3729(a)(1)(A), against all defendants)**

89.   Spicer re-alleges and incorporates by reference each allegation in paragraphs 1 to 88 of this complaint.

90.   By virtue of the acts described above, Abshire and Southwest knowingly presented or caused to be presented to the United States of America false or fraudulent Medicare and Medicaid claims for payment or approval, in violation of the Medicare rules and regulations, the AKS, and therefore the False Claims Act, 31 U.S.C. § 3729(a)(1)/31 U.S.C. § 3729(a)(1)(A).

91.   Abshire's claims for payment or approval from the Medicare and Medicaid programs were false in that the physicians' services claimed for were not medically necessary. Abshire presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

92.   Southwest's claims for payment or approval from the Medicare and Medicaid programs were false in that the facility fees claimed for were associated with medically unnecessary procedures. Southwest presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

93.   The instances where Abshire removed hardware from patients and replaced it with hardware from Alphatec Spine/Alphatec Holdings are "false" for purposes of the False Claims Act, as to Abshire, Alphatec Spine, and Alphatec Holdings, because such claims violate the AKS. *See* 42 U.S.C. § 1320a-7b(g).

94.   Upon information and belief, Alphatec Spine and Alphatec Holdings paid Abshire remuneration to induce him to order or recommend ordering their hardware for his patients. Upon information and belief, Abshire received remuneration from Alphatec Spine and Alphatec Holdings in return for ordering or

1  recommending ordering their hardware for his patients. Because Abshire furnished

2  Alphatec Spine and Alphatec Holdings' hardware to passive investors differently

3  than to non-investors (his patients), he failed to meet a key requirement of the

4  "investment interests" safe harbor, and the "investment interests" safe harbor does

5  not apply. *See* 42 C.F.R. § 1001.952(a)(1)(iii), (2)(v), (3)(i)(E).

6      95.    The United States of America, unaware of the falsity of the claims

7  made or submitted by Defendants, paid and continues to pay Defendants for claims

8  that would not be paid if the true facts were known.

9      96.    As a proximate cause of Defendants' false claims, the United States of

10  America has been damaged in an amount exceeding the jurisdictional limit, and to

11  be proven at trial.

12              **SECOND CAUSE OF ACTION**

13  **(For using false statements to get false claims paid in violation of the False**

14  **Claims Act, 31 U.S.C. § 3729(a)(2)/31 U.S.C. § 3729(a)(1)(B), against Abshire,**

15              **Southwest, and DOES 1 to 50)**

16      97.    Spicer re-alleges and incorporates by reference each allegation in

17  paragraphs 1 to 96 of this complaint.

18      98.    By virtue of the acts described above, Abshire and Southwest

19  knowingly made or used false medical records or statements of medical necessity

20  to get a false or fraudulent Medicare and/or Medicaid claim paid or approved by

21  the United States of America, in violation of the False Claims Act, 31 U.S.C. §

22  3729(a)(2)/31 U.S.C. § 3729(a)(1)(B).

23      99.    The United States of America, unaware of the falsity of the statements

24  or records material to the false claims made or submitted by Abshire and

25  Southwest, paid and continues to pay Abshire and Southwest for claims that would

26  not be paid if the true facts were known.

27      100.   As a proximate cause of Abshire and Southwest's false claims, the

28  United States of America has been damaged in an amount exceeding the

**COMPLAINT**

1    jurisdictional limit, and to be proven at trial.

2                          **PRAYER FOR RELIEF**

3          WHEREFORE, Spicer respectfully prays for judgment in his favor as

4    follows:

5          1.     For statutory damages in an amount to be established at trial, trebled

6    as required by law, and such civil penalties as are allowed by law;

7          2.     All costs and expenses of this action, including attorneys' fees, with

8    pre- and post-judgment interest; and

9          3.     For all other relief that the Court deems just and proper.

10

11   DATED:  May 3, 2017                Respectfully submitted,

12                                       KHOURI LAW FIRM, APC

13

14                              By:     _____

15                                       MICHAEL J. KHOURI
                                         Email: mkhouri@khourilaw.com
16                                       ANDREW B. GOODMAN
                                         Email: agoodman@khourilaw.com
17                                       Attorneys for qui tam plaintiff,
                                         MARK SPICER
18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Spicer demands a trial by jury in the above-entitled matter.

DATED:  May 3, 2017

Respectfully submitted,

KHOURI LAW FIRM, APC

By: _____

MICHAEL J. KHOURI
Email: mkhouri@khourilaw.com
ANDREW B. GOODMAN
Email: agoodman@khourilaw.com
Attorneys for qui tam plaintiff,
MARK SPICER

**COMPLAINT**

# CERTIFICATION OF SERVICE

<u>Case Name:</u> United States ex rel. Mark Spicer v. Bret B. Abshire, M.D., et al.
<u>Case No.:</u> Unknown at this time.
<u>Court:</u> United States District Court for the Central District of California
<u>Person(s) served</u>: The United States Attorney's Office, Central District of California and Attorney General of the United States
<u>Date served:</u> May 4, 2017

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) years and not a party to the within action. My business address is 24012 Calle De La Plata, Suite 210, Laguna Hills, California, 92653.

On **May 4, 2017,** I served the foregoing documents described as:

- **PLAINTIFF'S COMPLAINT FOR DAMAGES FOR:**

**(1) VIOLATIONS OF FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))**

**(2) VIOLATIONS OF FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(B))**

**DEMAND FOR JURY TRIAL**

**[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

- **WRITTEN DISCLOSURE TO UNITED STATES DEPARTMENT OF JUSTICE OF SUBSTANTIALLY ALL OF QUI TAM PLAINTIFF'S MATERIAL EVIDENCE AND INFORMATION PURSUANT TO 31 U.S.C. § 3730(b)(2)**

on the person(s) herein by placing a true copy thereof enclosed in a sealed envelope addressed to:

Civil Process Clerk
Office of the United States Attorney
Room 7516, Federal Building
300 North Los Angeles Street
Los Angeles, California 90012

1

Civil Process Clerk
U.S. Department of Justice, Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

in the following manner:

[X]   (BY CERTIFIED MAIL) I deposited such envelope in the mail at Laguna Hills, California.  The envelope was mailed with postage thereon fully prepaid and return receipt requested.

[ ]   (BY PERSONAL DELIVERY) I caused each envelope to be delivered by hand to the office of the addressee.

[ ]   (BY OVERNIGHT COURIER) I caused each envelope, with delivery charges prepaid, to be sent by Overnite Express.

[ ]   (BY TELEFACSIMILE) I caused the transmission of the above-entitled document to the interested parties at the telefacsimile number listed on the attached Service List on _____, at Laguna Hills, California.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, on the above date the envelope was sealed and placed for collection and mailing following the ordinary business practices of our office. This results in the envelope being delivered to the United States Postal Service that same day, with postage thereon fully prepaid. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

Executed on **May 4, 2015**, at Laguna Hills, California.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Jonathan Knauft

2

CERTIFICATION OF SERVICE